# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **TONIA R. BOSTON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | )     **Civil Action No. 1:03-0116** |
| **v.** | )     **Judge Haynes** |
| | ) |
| **AETNA LIFE INSURANCE COMPANY** | ) |
| | ) |
| **Defendant,** | ) |

## M E M O R A N D U M

Plaintiff, Tonia R. Boston, filed this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. 1001 et seq., against the Defendant, Aetna Life Insurance Company, an insurance company authorized to do business in the State of Tennessee. This action arises from the Defendant's denial of Plaintiff's application for long term disability ("LTD") insurance benefits under her employer's ERISA plan. Plaintiff seeks recovery of past and future LTD benefits as well as her attorney fees, pre- and post-judgment interest as well as her costs in this action.

Before the Court are: Plaintiff's motion for judgment on the record (Docket Entry No. 41) and Defendant's renewed motion for judgment on the record (Docket Entry No. 43).[1]

In her motion (Docket Entry No. 14), Plaintiff contends, in sum: (1) that Defendant's decision to deny LTD benefits to Plaintiff was arbitrary and capricious; (2) that Defendant breached a fiduciary responsibility to Plaintiff when Defendant failed to resolve a dispute about the physical requirements her occupation; (3) that the Defendant ignored medical evidence of her

---

[1] A motion for judgment on the record is the appropriate procedural method to obtain judicial review under ERISA. Wilkins v. Baptist Healthcare Sys., Inc., 150 F.3d 609, 619 (6th Cir. 1998).

1

injury from Plaintiff's doctors; and (4) that the Defendant had conflict of interest that affected the Defendant's decision to deny LTD benefits.

In support of its motion (Docket Entry No. 44), Defendant asserts, in essence: (1) that the appropriate standard of review here is the arbitrary and capricious standard; (2) that Defendant's decision is supported by a reasoned explanation of the evidence in the administrative record; (3) that the breach of fiduciary duty standard does not apply here, but in any event, Plaintiff has not shown any breach of that duty; (4) that Defendant considered Plaintiff's doctors' medical records in its benefits determination; and (5) that Defendant's denial of benefits was not based on any conflict of interest.

## A. REVIEW OF THE FACTUAL RECORD

For more than eighteen years, Plaintiff was employed by Graphic Packaging Corporation ("GPC") in Lawrenceburg, TN. (Administrative Record ("AR") No. 00078). In her ten years tenure, Plaintiff was a quality control technician ("QCT"). While employed by GPC, Plaintiff participated in the insurance plan with LTD benefits that was provided by GPC, but was issued and administered by Defendant. (Docket Entry No. 9, Defendant's Answer at ¶ 5).

The LTD insurance plan "pay[s] a Monthly Benefit for a period of total disability caused by a disease or accidental bodily injury." (AR No. 00011). This "period of disability" begins on the first day that an insured person is "totally disabled as a direct result of a significant change in [their] physical or mental condition occurring while [they] are insured under [the LTD] Plan." (AR No. 00012). The period of disability ends, among other reasons, when the insured person is not totally disabled or fails to provide proof that he or she remains totally disabled. Id. LTD benefits are payable if the period of disability "starts while you are covered and continues during and past the waiting period." Id.

2

On May 9, 2002, Plaintiff stopped working due to back, neck, and shoulder pain. (AR No. 00253)[2] and she filed claims for temporary disability income ("TDI") benefits that Defendant approved through November 8, 2002. (AR Nos. 00070, 00239). While Plaintiff was receiving TDI benefits, Defendant reviewed Plaintiff's eligibility to receive LTD benefits. (AR Nos. 00230-00231).

Three time periods are relevant to the determination of benefits under the LTD plan. (AR No. 00011). First is the "waiting period," i.e., the first 180 days of total disability that must pass before LTD benefits start. (AR Nos. 00003, 00011). The second relevant time period covers the 24 months thereafter. To be deemed "totally disabled" during this period an insured person must be "not able, solely because of injury or disease, to perform the material duties of [her] own occupation." (AR No. 00011). Id. After the 24 month period, to be deemed "totally disabled" the insured person must be "not able, solely because of injury or disease, to work at any reasonable occupation." Id. "Reasonable occupation" is defined as "any gainful activity for which [the insured is], or may reasonably become, fitted by education, training, or experience." Id.

During its review of Plaintiff's eligibility for LTD benefits, Defendant sought documentation of Plaintiff's disability, including her medical records and test results from Plaintiff's physicians. (AR No. 00231). On October 7, 2002, Defendant sent letters requesting medical records from March 12, 2002 to the date of its letter. Dr. Matthew Dobias, Plaintiff's primary care physician; Dr. William Leone, Plaintiff's pain management doctor; and Dr. William Schooley, Plaintiff's neurosurgeon. (Docket Entry No. 44, p. 2; AR Nos. 00162, 00173, 00183, 00204).

---

[2] Plaintiff's last day worked was May 9, 2002; her first day of work missed was May 13, 2002. (AR No. 00221). Plaintiff was terminated from her job by GPC on August 6, 2002. (AR No. 00233).

3

Defendant received Plaintiff's medical records from Dr. Dobias on October 23, 2002. (AR No. 00233). Dr. Dobias's records reflect that on May 13, 2002, Plaintiff had restricted range of neck motion anterior, posterior, and with rotation caused by cervical spasm, but had good biceps and triceps. AR No. 00168. Yet, her triceps were a little weaker on the right side. Dr. Dobias referred Plaintiff to a specialist. Id. On June 25, 2002, Plaintiff's chronic neck pain continued and Plaintiff informed Dr. Dobias that she would apply for disability. (AR No. 00167). On September 11, 2002, Dr. Dobias found Plaintiff's neck to be very rigid. (AR No. 00164).

Defendant received Plaintiff's medical records from Dr. Leone on October 29, 2002. (AR No. 00234). Dr. Leone's record revealed that on May 30, 2002, Plaintiff was suffering from cervical degenerative disc disease and cervical radiculopathy, and would be scheduled for a cervical discography in one month. (AR No. 00174-00175). Yet, Dr. Leon encouraged Plaintiff to return to work in the near future. Id. On June 23, 2002, Plaintiff underwent a cervical discography at C4-5, C5-6, and C 6-7, that revealed her C5-6 previous fusion to be intact, but that her C6-7 disc revealed symptomatic internal disc disruption. (AR No. 00176). On August 1, 2002, a CT scan of her cervical spine revealed central extravasation of contrast at C4-C5 compatible with annular rupture, compression of the neuroforamina at C6-C7 on the right secondary bulging disc, but normal C7-T1 disc. (AR No. 00181). On July 24, 2002, Plaintiff complained of worsening pain that caused her to be unable to work. Dr. Leone prescribed an increased dosage fo OxyContin, but decreased her OxyIR that he had earlier prescribed. Plaintiff advised by Dr. Leone that she did not want additional surgeries and Dr. Leone encouraged physical therapy and traction at home. (AR Nos. 177-178). On August 19, 2002, Plaintiff's pain was described as continuous but managed, with a decreased range of motion along the right

4

trapezius and splenius cervicis muscles, a stiff neck. (AR No. 00180). Plaintiff could not move her head to the right at all and a CT scan showed a C6-7 neural foraminal stenosis on the right, consistent with the radiculopathy.

Defendant received Plaintiff's medical records from Dr. Schooley on November 1, 2002. (AR No. 00234). Dr. Schooley's records reflect that on March 12, 2002, Plaintiff complained of bilateral arm, shoulder, and neck pain. (AR No. 00205). On March 26, 2002, Plaintiff reported pain and numbness in her right arm with pain radiating down into her right shoulder. Plaintiff who had a previous well-fused C5-6 ACD, also had a some subluxation on flexion. (AR No. 00209). The extension at the level above Plaintiff's decompression looked good and her nerve roots filled out well on her MRI. On May 21, 2002, Plaintiff had midline neck pain that extended into her right shoulder, some pain to abduction in her right shoulder, an MRI showing C4-5 disc protrusion, and a little subluxation at the 4-5 level and the level above the fusion; the fusion was described as looking excellent. Id. On July 3, 2002, Plaintiff had persistent neck and arm pain; a discogram by Dr. Leone that was positive at the level below the previous fusion and negative at the level above the fusion, but was bulging on her MRI. Id. Plaintiff was put on cervical traction. Id. On July 23, 2002, Plaintiff complained of severe neck and arm pain on the right side and desired physical therapy with cervical traction again. Id.

On August 9, 2002, Dr. Schooley diagnosed Plaintiff as having cervical spondylosis, neck and arm pain, and C4-5 disc protrusion. (AR Nos. 00187-00188). Dr. Schooley estimated one year or more for Plaintiff's maximum medical improvement, but opined that her estimated return to work is "undetermined." Id. As of August 20, 2002, Dr. Schooley restricted Plaintiff from work and could not determine when Plaintiff would be able to work. (AR Nos. 00197-00198). On October 1, 2002, Plaintiff had a myelogram that did not show any signs of nerve

5

root impingement and Dr. Schooley suggested physical therapy. (AR No. 00208). On October 28, 2002, Plaintiff was indicated as able to return to work on September 4, 2002. (AR Nos. 00199-00200). This decision was later determined to be a mistake and was corrected in a letter from Dr. Schooley dated January 22, 2003; the 9/4/02 date was filled in under "return to work" on Defendant's certification form when it was actually meant to be the date Plaintiff would be referred to Dr. Berkman. (AR Nos. 00237, 00414).

On November 19, 2002, Plaintiff wad diagnosed as having cervical degenerative disease and was unable to work at any job. (AR No. 00210). As of December 31, 2002, Plaintiff continued to be diagnosed with cervical spondylosis as well as neck and arm pain. (AR Nos. 00202-00203). Dr. Schooley also opined that it would take 1 year or longer for Plaintiff's maximum medical improvement to be reached, and that it was undetermined when she would be able to return to work. Id.

In a letter dated September 4, 2002, Dr. Richard Berkman, Plaintiff's consulting neurosurgeon, wrote Dr. Dobias on his examination of Plaintiff:

> I had the pleasure of meeting [Plaintiff] in clinic. She is a patient of Dr. Leone's, who had referred her to Dr. Schooley for chronic problems in her neck and radiating right arm pain. The pain seems to radiate down her right arm in the distribution of the C7 nerve root, over the triceps muscle, into the forearm. The left arm has some discomfort, but not anything as compared to the right. There are times when the pain has become unbearable for her, and she thinks that recently it has gotten much worse.

> She has had a CT scan of her neck from March [2002] by Dr. Schooley. That CT scan is not available for review, but apparently, according to the report, it did not show any significant disease. The MRI scan is available for review, also from March of 2002 and it shows on the sagittal views some cervical spondylosis at C6-7 that was present prior to her surgery at the C5-6 level, which was about five to six years ago.

> She has undergone pain care management. She is presently taking Oxycontin 10 mg, three times a day. She is on Wellbutrin and Neurontin 20 mg, two times a day. She has had Dr. Karpos to evaluate her right shoulder for possible rotator

cuff involvement but he felt that, while her shoulder may be problematic, it is not contributing significantly to her pain.

She and I have gone over her films today in clinic, and I am somewhat underwhelmed with the MRI appearance. There does appear to be some spondylosis at C6-7, but there ought to be plenty of room for that nerve to escape the neuroforamen without causing her pain that is as severe as she complains. So I would be tempted to recommend a cervical mylogram and post-mylogram CT to see whether or not there is nerve root cut-off, particularly at C6-7 on the right.

I understand she has already had a discogram which was positive at C6-7 and negative at C4-5. Right now, what I think we should do is check a cervical myleogram and post-myelogram CT and look at that. I would be somewhat hesitant about recommending any more surgery, but I think that a good quality myelogram might help resolve this. She has had an EMG nerve conduction study which did not show any evidence of nerve root damage.

(AR No. 206-207).

Defendant's Nurse Consultant, Karen Whitcher, reviewed Plaintiff's medical records to determine if Plaintiff were totally disabled and therefore eligible to receive LTD benefits. (Docket Entry No. 44 at p. 2, AR No. 00161). Adam Craigmiles, Defendant's disability analyst assigned to Plaintiff's claim, wrote a note to Defendant's internal file dated January 3, 2003, reflecting that Nurse Whitcher suggested that Plaintiff's preclusion from work was reasonable for some time given that the records revealed an annular tear in Plaintiff's C4-5 region and the medium/heavy occupational description of a QCT. (AR Nos. 239-240). Id. Nurse Whitcher's official report, dated January 15, 2003, reported the following:

[Plaintiff] is a 43 y/o quality control technician who ceased work 5/02 due to neck pain. [Plaintiff] has a history of anterior cervical fusion of C5-6. Because of her pain radiating into her shoulder and arm, she was referred and worked up for possible rotator cuff injury. These records are not available, but apparently no intervention was recommended regarding her shoulder.

On 5/13/02 [Plaintiff's] PCP (Dobias) noted that [Plaintiff] had cervical spasm. On 6/25/02 he again noted that [Plaintiff] had chronic neck pain. On 7/15/02 he saw her for migraine headache and was prescribed Toradol and Imitrex.

On 7/24/02 [Plaintiff] was evaluated by the pain management clinic. Office visit notes indicate that [Plaintiff] was considering surgery and was referred for physical therapy.

On 9/4/02 Dr. Berkman (neurosurgeon 2d opinion) indicated that he was hesitant to recommend surgery and that the EMG did not show nerve root impingement. On 10/1/02 Dr. Schooley (neurosurgeon primary) noted that her mylegram showed no evidence of nerve root impingement and that he was referring her for additional physical therapy. [Plaintiff] was taking Soma and Oxycontin at that time.

APS from Dr. Schooley dated 12/31/02 noted that [Plaintiff] will be revaluated today. She has an appt with Dr. Berkman on 1/22/03.

Although [Plaintiff] has indicated to her pain management providers that she is considering surgery, the medical records from her neurosurgeons do not support that she is a surgical candidate. Neither Dr. Schooley or Berkman has recommended surgical intervention. Nerve conduction studies and myelogram do not show objective evidence of radiculopathy or nerve root impingement. Per Dr. Berkman's note 9/4/02, [Plaintiff's] fusion was stable.

Based on the currently available medical information, it is reasonable to expect that [Plaintiff] would have no limitation/restriction regarding walking/standing/use of legs, infrequent lifting up to 20 pounds, significant limitation of turning head and nodding motions. One would anticipate improvement in [Plaintiff's] condition over time. If prognosis and course of recovery are not clearly defined after visit with Dr. Bergman 1/22/03 suggest consideration of [a Functional Capacity Evaluation].

(AR No. 161).

On January 24, 2003, Defendant received the following letter from Dr. Dobias dated

January 17, 2003:

This letter is to give you an overview as to [Plaintiff], the 43-year-old lady who is well known to me who I have seen for a number of years. She has had a lot of neck problems and she has had a fusion done by Dr. McCombs in Nashville for which she has continued to have a lot of pain. She has been to multiple places for control of this pain including Mayo Clinic and has seen multiple neurosurgeons but continues to have the severe pain.

I do not feel (unless at some point miraculously that we could control the pain) that she would be able to work again.

8

(AR Nos. 00154, 00243). (emphasis added).  Nurse Whitcher reviewed Dr. Dobias's letter and ,

on January 24, 2003, and after consulting with a LTD analyst, Whitcher requested a Functional

Capacity Evaluation ("FCE") "based on the unclear nature of the clinical information in

combination with Dr. Dobias' assertion that [Plaintiff] will not be able to work again."  (AR No.

00243).

On January 30, 3003, the Defendant received a letter from Dr. Schooley dated January

28, 2003 that was forwarded by the Plaintiff:

> This is a letter to correct the previous letter that states [Plaintiff] was released to
> work with no restrictions on September 4, 2002.  In fact, [Plaintiff] is a patient
> who has been under my care since March 12, 2002.  She has severe cervical
> spondylosis and is totally disabled at this time.  <u>She has been evaluated, has tried
> conservative treatment and she is a candidate for surgery.  [Plaintiff] is totally
> disabled beginning March 12, 2002 until March 25, 2003, at that time we will re-
> evaluate and decide that her plan of care will be.</u>

(AR Nos. 00243, 00413-00417). (emphasis added).  Dr. Schooley's letter was forwarded to Mr.

Craigmiles (AR No. 00243), but Dr. Schooley is not mentioned in notes on the Defendant's

decision on Plaintiff's eligibility for benefits on February 26, 2003.  (AR No. 00243-00246).

Plaintiff was given a FCE at Defendant's request on February 18, 2003 "to assess her

current functional ability to return to work in any occupation."  (AR No. 00075).  The FCE was

performed by Rob Pearse, an Exercise Physiologist/Certified Functional Evaluator/Certified

Ergonomic Specialist.  (AR No. 00076).  Mr. Pearse's evaluation is as follows:

> **FUNCTIONAL ABILITIES**
> [Plaintiff] presented to this evaluation with significant cervical guarding and
> difficulty with sitting during the intake interview.  She alternated between sitting
> and standing for the 50 minutes of the intake interview. ... She stated a low
> increase in cervical and thoracic pain from stepping for 3 minutes.  Cervical range
> of motion was measured with dual spinal inclinometers with all movements
> increasing her discomfort.  Flexion, lateral flexion left, and rotation left were the
> most painful. ... She stated increased cervical and right upper back pain with grip
> strength testing.  Dynamic lift testing was performed with good lifting mechanics
> and a breakdown in right upper extremity lifting mechanics in all lifting planes.

9

She had the most difficulty with lifting to overhead. … She demonstrated significant difficulty with right upper extremity repeated reaching in all planes due to severe right upper back and cervical pain. Her range of motion for her right upper extremity was functional, but she could not tolerate repeated reaching. She demonstrated functional ability with the left upper extremity. She did not have any significant difficulty with bilateral handling and fingering. [Plaintiff] did demonstrate some difficulty with standing tolerance during testing and had to sit after 44 minutes of testing.

**FUNCTIONAL LIMITATIONS**
Lifting Restrictions are as follows:
Floor to Shoulder Lifting Levels – 20 lbs Occasionally
Knuckle to Overhead Lifting – 10 lbs Occasionally
Carrying – 20 lbs Occasionally/15 lbs Frequently
Positional Restrictions are recommended as follows:
No Repeated Reaching with the right upper extremity
Occasional Stooping, Reaching with right upper extremity
Frequent Walking, Crouching, Reaching with left upper extremity, Handling – right upper extremity, Sitting, Standing

**CONCLUSIONS**
Casual observations outside of the evaluation process were consistent with similar activities tested within the evaluation. Her cervical range of motion is limited but functional for most activities. … [Plaintiff] can be classified in the LIGHT PDC level for work for low and mid level lifting, and with carrying. She can be classified in the SEDENTARY PDC level for work for high level lifting. Overall [Plaintiff] can be classified in the LIGHT PDC level for work with the above listed lifting, carrying, and positional restrictions. She can perform occasional reaching with the right upper extremity, but no repeated reaching. She will also need to alternate between sitting and standing positions.

(AR Nos. 00075-00076).

The Defendant also obtained Plaintiff's job description from GPC to determine the physical task requirements of the position. (AR Nos. 00143-00144). Under the heading "Part III – Physical/Mental Requirements" in the job description of a QCT, GPC listed: "Occasional physical effort, for example prolonged standing, regular lifting." (AR No. 144). Defendant also obtained, from the Department of Labor's Dictionary of Occupational Titles ("DOT"), an occupational description of a QCT. (AR No. 147). The DOT occupational description considers the position one that requires a "light work" level of strength, which means lifting up to 20 lbs.

10

occasionally, up to 10 lbs. frequently, or a negligible amount constantly. Id. The DOT's physical demands analysis also reflects that the position requires frequent reaching, handling, and fingering. Id.

After collecting the above information, Defendant determined that Plaintiff was not totally disabled under the terms of the LTD plan and therefore denied Plaintiff's claim for LTD benefits. (AR No. 246). The benefits denial letter sent to Plaintiff on February 26, 2003 gives Defendant's reasoning for its denial of benefits:

> To qualify for disability benefits during the first 24 months you must be unable, solely because of injury, disease or pregnancy-related condition, to perform the material duties of your own occupation.
>
> After thorough review of your claim, including a review of medical records from Drs. Leone, Dobias, and Schooley, it was determined that the unclear nature of the submitted information warranted further investigation. According to the [FCE] performed on February 18, 2003, it was determined that you can be classified in the light physical demands capacity. Additionally, your functional limitations were determined as follows:
>
> Lifting restrictions are recommended as follows:
> - Floor to Shoulder Lifting Levels – 20 lbs Occasionally
> - Knuckle to Overhead Lifting – 10 lbs Occasionally
> - Carrying – 20 lbs Occasionally/15 lbs Frequently
>
> Positional Restrictions are recommended as follows:
> - No Repeated Reaching with the right upper extremity.
> - Occasional Stooping, Reaching with right upper extremity
> - Frequent Walking, Crouching, Reaching with left upper extremity, Handling – right upper extremity, Sitting, Standing
>
> After a review of the job description provided by your employer by our Vocational Consultant, your occupation as [QT] is considered light, as defined by the [DOT].
>
> In view of the above, we are denying your claim for disability benefits. You are not totally disabled from performing the material duties of your own light occupation.

(AR Nos. 00138-00139).

11

In its denial letter, Defendant advised Plaintiff that it would review any additional information, such as medical records outlining doctors' restrictions, diagnostic studies such as test results and clinical findings, any information specific to the conditions for which Plaintiff was claiming disability, and any other information or documentation that could help in evaluating Plaintiff's claim for the period May 9, 2002 through February 18, 2003. (AR No. 00139).

Plaintiff responded on March 10, 2003 by submitting a January 22, 2003 letter from Dr. Berkman to Dr. Schooley, after Dr. Berkman's second consultation with Plaintiff:

> Thank you for sending [Plaintiff] back to see me. The discogram, as you know, was positive at C6-7, negative at C4-5. She has a fusion at C5-6, but I will have to say that this is not a healthy looking fusion given that it is five years post-op. By this point you ought to see a solid block of bone melding between the C4 and C6 vertebral bodies.
>
> She was a heavy smoker after the surgery and I suspect that she has got a lot of fibrous union in there in addition to some bone growth. And what I would, therefore, have to say, would be that if [Plaintiff] can live without surgery, that would be the best option. However, if she cannot, then I would recommend an anterior cervical discectomy and fusion at C6-7. She is now off of cigarettes, and I would look at the C5-6 level at the same time and consider drilling out the C5-6 disc space and putting a fresh bone fusion in there, and I would augment her fusion with some bone morphogenic protein. We would put a plate on there, and if she stays off her cigarette smoking she ought to get a good solid fusion.
>
> This is just an idea. I think the chance of success is probably 50/50. But if that is what she wants, I know that we can do a safe job, although you will need to discuss this with her and go over with her again the risks and benefits of surgery, and I do want to thank you for asking me to look in on her case.

(AR No. 00112). After reviewing this letter with Nurse Whitcher on March 27, 2003, Mr. Craigmiles determined that the information included in this letter was insufficient to overrule the original decision and that the denial decision would be upheld. (AR No. 00248).

On April 1, 2003, Defendant received a Physical Demands Analysis Worksheet ("PDAW") from Plaintiff's former supervisor at GPC, Pam Lindsey. Id. This PDAW reflects

that Plaintiff's position required frequent (34-66% of work day) reaching above the shoulder level. (AR No. 00110). After receiving the PDAW, Defendant's vocational consultant, Harriet Burk, contacted Ms. Lindsey on April 3, 2003. (AR Nos. 00248-00249). Ms. Burk's note of the conversation between herself and Ms. Lindsey states that Plaintiff's original, usual job included work as a "scorebin tester" for cardboard products, which consumed 25-33% of a shift. Id. This "scorebin tester" work involved overhead reaching that was 8-10 inches above Plaintiff's shoulder level. Id. However, Ms. Burk's note also explained that:

> On other shifts, Pam has the QA techs rotate their activities. In the case of [Plaintiff], for the last two years, the other QA tech who shared her shift was willing to take on all of the scorebin activity. As a result, [Plaintiff] worked exclusively in the "front" of the shop with no scorebin tester work at all.

Id. Ms. Burk's note also stated that Plaintiff performed quality assurance for film and other products, which has a DOT strength requirement of light and required frequent reaching at a level (waist, shoulder, etc.) that was unspecified. Id.

After reviewing Ms. Burk's conversation with Ms. Lindsey, on April 8, 2003, Mr. Craigmiles determined that because for the last two years. GPC had eliminated the frequent reaching requirement In the PDAW, Plaintiff was capable of the material duties of her occupation, and affirmed the denial of her claim. (AR Nos. 00249-00250). The decision to uphold Defendant's denial of benefits was communicated to Plaintiff through a letter dated April 7, 2003:

> As you are aware from our previous correspondence dated February 26, 2003, to qualify for disability benefits during the first 24 months you must be unable, solely because of injury, disease or pregnancy-related condition, to perform the material duties of your own occupation.
>
> We have received and reviewed additional information from you, including a letter from Dr. Richard Berkman dated January 22, 2003. We had this information reviewed with our medical consultant. Although Dr. Berkman's letter suggests you are a possible surgical candidate, he recommends that the best

Case 1:03-cv-00116   Document 51   Filed 07/11/06   Page 13 of 27 PageID #: 125

option is to not surgically intervene. The overall review of this information does not suggest a level of impairment so significant that you can conclusively be declared unable to perform the material duties of your own occupation.

It is important for you to understand that simply being diagnosed with a condition does not automatically qualify you for benefits. Rather, we must determine whether the available medical information supports that your conditions prevent you from performing the material duties of your own occupation.

In addition, your employer provided more detailed information about your job as [a QT]. On April 3, 2003, we were advised that for the past two years you have worked in the front of the shop with no scorebin tester work at all, thereby eliminating any overhead reaching demands. After reviewing this information, as well as a [PDAW] provided March 31, 2003, with our Vocational Consultant, it was confirmed that your occupation as [a QT] is considered light, as defined by the [DOT].

According to the [FCE] performed on February 18, it was determined that you can be classified in the light physical demands capacity with sedentary restrictions in regard to work for high level lifting. As frequent overhead reaching is no longer considered a material duty of your occupation and as evaluation indicates the capability to perform light work, then you do not meet the definition of disability as defined by your policy.

(AR Nos. 00099-00100).

Also on April 8, 2003, but after the decision to uphold denial of benefits had been made, Plaintiff telephoned Defendant requesting the status of her claim. (AR No. 00250). Mr. Craigmiles informed Plaintiff that information received from Ms. Lindsey revealed that overhead lifting duties had not been required of her for the last two years. Id. Plaintiff responded by stating that this information was false and that because of cutbacks, she was required to work alone and therefore, did perform these duties. Id. Mr. Craigmiles referred Plaintiff to GPC to discuss this discrepancy and advised her to submit objections and any other information to Defendant's appeals unit. Id. The record does not reflect that either Plaintiff or Defendant contacted GPC about this discrepancy. (Docket Entry No. 14 at p. 4; Docket Entry No. 44 at p. 5).

On June 3, 2003, Plaintiff's counsel contacted Defendant to advise that he would be representing Plaintiff in her appeal of Defendant's denial of benefits. (AR No. 00306). In her appeal, the only additional information Plaintiff presented to Defendant's appeals unit was a letter from Dr. Schooley dated July 29, 2003:

> [Plaintiff] is a patient of mine who has undergone a cervical fusion that was carried out on 5/22/03. Her discs were degenerated at that time and the surgery consisted of removing the discs and replacing with bone and then also plating her spine anteriorly. <u>She had a successful operation at that time but she still has degenerative disease in her discs. She at this time, cannot do any bending or lifting. She will have to reposition her neck frequently. I think this condition will be with her for several months, until her pain improves. She still has a considerable amount of pain and because of that, we have ordered a CT scan of her neck and we will have that back at her next office visit.</u>

(AR No. 00316). (emphasis added).

On August 25, 2005, Plaintiff's file was referred to Defendant's Medical Director, Dr. Tracey Schmidt for medical review. (AR No. 00252). Dr. Schmidt's review was of Plaintiff's submitted medical records. (AR Nos. 00304-00306). After conducting the file review, Dr. Schmidt recommended:

> File lacks objective evidence of a physical functional capacity impairment to a full-time light occupation with the restrictions of floor to shoulder lift of 20 lbs occasionally, knuckle to overhead lift 10 lbs occasionally, carrying 20 lbs occasionally/15 lbs frequent, she can perform occasional reaching with the right upper extremity, but no repeated reaching, occasional stooping, frequent walking, crouching, reaching with left upper extremity, handling right upper extremity, sitting and standing. Needs to alternate between sitting and standing postures from 2/18/03 until 5/22/03.

(AR No. 00307).

The Defendant subsequently denied Plaintiff's appeal of her denial of LTD benefits, explaining its decision in a letter dated September 10, 2003:

> In order to give the appeal full consideration, [Plaintiff's] file with Dr. Schooley's letter was referred to our Medical Director for a complete and independent review. Our Medical Director evaluated the information to determine if

15

[Plaintiff's] condition supported a functional impairment from her own occupation from her cease work date of May 9, 2002 through the present.

The clinical information documented prior to her surgery, especially the results of the February 18th, 2003 FCE confirmed through testing, her ability to work in her own occupation. While the test results supported some restrictions like no repeated reaching and the need to change positions, these restrictions alone would not have prevented [Plaintiff] from performing the material duties of her own occupation. A discogram dated June 28, 2002 reported [Plaintiff's] previous fusion intact. The EMG on March 7, 2002 was within normal limits. Office notes from Dr. Dobias dated May 13, 2002 noted some right triceps weakness. The file contained no physical therapy notes or any activity of daily living impairments from [Plaintiff] to evaluate.

In reviewing [Plaintiff's] eligibility for LTD benefits, [Defendant] must rely on objective medical evidence to assess her functional capacity. Since the FCE found [Plaintiff] functioning at the level required to perform the material duties of her own occupation and no other information was considered to dispute the findings of this evaluation, her claim will remain closed.

(AR Nos. 302-303).

Plaintiff subsequently filed this action, claiming that she was denied LTD

benefits in violation of ERISA. (Docket Entry No. 14, p. 5; Docket Entry No. 44, p. 6).

## B. CONCLUSIONS OF LAW

### 1. Standard of Review

For the determination of the governing standard of review in this ERISA action, the issue

is whether the plan grants the administrator the discretion to determine eligibility for benefits.

Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Miller v. Metro Life Ins. Co.,

925 F.2d 979, 983 (6th Cir. 1991). If the ERISA plan expressly grants the plan administrator

"discretionary authority to determine eligibility for benefits or to construe the terms of the plan,"

then the arbitrary and capricious standard of judicial review applies. Firestone, 489 U.S. at 115;

Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 380 (6th Cir. 1996). In summary, under

the arbitrary and capricious standard, the Court must decide if the decision was made in good

16

faith, and if the decision is not contrary to the facts and law, i.e., whether the Administrator's decision is "rational in light of the plan's provisions." Daniel v. Eaton Corp., 839 F.2d 263, 267 (6th Cir. 1988).

Absent such language in the plan, the de novo standard of review applies. Firestone, 489 U.S. at 115. Under the de novo standard, the district court is "to determine whether the administrator or fiduciary made a correct decision," Perry v. Simplicity Eng'g, 900 F.2d 963, 966 (6th Cir. 1990), without deference to the fiduciary's determination of benefits nor presumption as to the correctness of the fiduciary's decision. Id.

Here, the parties agree that the LTD plan gives Defendant discretionary authority. (Docket Entry No. 14, p. 1; Docket Entry No. 44, p. 6). Language in the LTD plan documents also designates Defendant as a fiduciary with discretion to determine eligibility for benefits:

> For the purposes of section 503 of Title 1 of [ERISA], Aetna is a fiduciary with complete authority to review all denied claims for benefits under this policy. In exercising such fiduciary responsibility, Aetna shall have discretionary authority to: [1] determine whether and to what extent employees and beneficiaries are entitled to benefits; and [2] construe any disputed or doubtful terms of the policy.

(AR No. 00064). Given that the LTD plan expressly grants Defendant full discretion to determine benefits the administrative record reflects that in fact, Defendant did exercise such authority, the Court concludes that the arbitrary and capricious standard applies to Plaintiff's claim.

### 2. Breach of Fiduciary Duty

Plaintiff argues that Defendant breached its fiduciary duty to her when it failed to resolve the question that Plaintiff raised on whether the reaching function remained a physical requirement of her job at GPC. Plaintiff contends that Defendant was required to satisfy its fiduciary duty under 29 U.S.C. § 1104(a)(1) in its administration of the LTD plan. As discussed

above, if an ERISA plan expressly grants the plan administrator "discretionary authority to determine eligibility for benefits", then the arbitrary and capricious standard of review applies. Firestone, 489 U.S. at 115. The Sixth Circuit has held that because 29 U.S.C. § 1132(a)(1)(B)(5) provides a remedy to recover benefits under the terms of the plan, an ERISA Plaintiff is precluded from asserting a claim for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3). Wilkins, 150 F.3d at 615.[3] Otherwise, ERISA plaintiffs could "simply characterize a denial of benefits as a breach of fiduciary duty, a result which the Supreme Court has expressly rejected." Id. at 616.

### 3. Review of Administrator's Decision under Arbitrary and Capricious Standard

"The arbitrary and capricious standard is the least demanding form of judicial review of administrative action." Calvert, 409 F.3d at 292 (quoting McDonald v. Western Southern Life Ins., 347 F.3d 161, 169 (6th Cir. 2003)). "When applying the arbitrary and capricious standard, the Court must decide whether the plan administrator's decision was rational in light of the plan's provisions. Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." McDonald, 347 F.3d at 169 (quoting Williams v. International Paper Co., 227 F.3d 706, 712 (6th Cir. 2000)). The administrator's decision "will be upheld 'if it is the result of a deliberate reasoned process and if it is supported by substantial evidence.'" Evans, 434 F.3d at 876 (quoting Baker v. United Mine Workers of America Health & Retirement Funds, 929 F.2d 1140, 1144 (6th Cir.1991)).

---

[3] 29 U.S.C. § 1132 provides in relevant part: "(a) A civil action may be brought – (1) by a participant or beneficiary … (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan … (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan …" Id. 29 U.S.C. § 1132(a)(3) has been interpreted as a "catchall provision" to allow relief for individuals without other adequate remedies. Wilkins, 150 F.3d at 615.

Yet, the arbitrary and capricious standard does not make Courts "rubber stamps for any plan administrator's decision as long as the plan was able to find a single piece of evidence – no matter how obscure or untrustworthy – to support a denial of a claim for ERISA benefits." McDonald, 347 F.3d at 172. "[T]he ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." Spangler v. Lockheed Martin Energy Sys., Inc., 313 F.3d 356, 362 (6th Cir. 2002).

In the Sixth Circuit, when a district court reviews an ERISA plan administrator's decision to deny benefits, the Court "may only consider those materials that were available to the plan administrator when it made its final decision." Shelby County Health Care Corp. v. Southern Council of Indust. Workers, 203 F.3d 926, 932 (6th Cir. 2000). As a general rule, the administrator's written decision and the information in the administrative record are the bases for judicial review. Peruzzi, 137 F.3d at 433-34. This judicial review "inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issue." Evans, 434 F.3d at 876 (quoting McDonald, 347 F.3d at 172). Although administrators are not required to "accord special weight to the opinions of a claimant's physician", they also "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Evans, 434 F.3d at 877 (quoting Black & Decker, 538 U.S. at 834).

In its determination on Plaintiff's claim for LTD benefits during the first 24 months of her eligibility, Defendant was required to determine if she were able to perform the material duties of her own occupation. (AR No. 00011). That determination requires consideration of Plaintiff's physical disabilities and the material duties of Plaintiff's own job. Under the LTD plan, during the first 24 months of benefits, the total disability mst exist based upon Plaintiff's

physical disabilities so as to preclude her from performance of the material duties of her job at GPC.

Plaintiff's medical records extensively reflect that she was having neck and arm pain, that she was diagnosed with severe cervical spondylosis and degenerative disease in her discs, that her previous fusion did not look healthy, and that she was a surgical candidate. (AR Nos. 00112, 00207, 00243, 00316). Drs. Dobias and Schooley also have diagnosed Plaintiff as totally disabled and stated that she could not perform any work. (AR Nos. 00145, 00243). These physicians, however, did not reflect their consideration the material duties of Plaintiff's occupation. The Defendant therefore requested Plaintiff undergo a FCE to determine whether she would be able to perform the material duties of her job. (AR No. 00243). The results of the FCE show that Plaintiff was able to perform "light" work, but that she could not perform repeated reaching with her right arm and could only perform overhead lifting of 10 lbs. or less occasionally. (AR 00075). These results are not inconsistent with Plaintiff's medical records, and Plaintiff has not challenged the validity of the FCE.

The Court finds that Defendant arbitrarily and capriciously ignored the fact that reaching and lifting were material duties of Plaintiff's occupation as a QCT in denying her LTD benefits. The plan's definition of totally disabled during the relevant time period is being unable to perform the material duties of Plaintiff's own job. (AR No. 00011). In making its determination to deny benefits, Defendant chose to rely primarily on the general classification of "light" work as determined by the FCE and DOT. (AR Nos. 00099-00100). In doing so, Defendant selectively ignored the specific limitations in the FCE that correspond with the material duties of Plaintiff's position, as defined in the DOT and PDAW.

In GPC's original job description, one of the physical tasks required of a QT is regular lifting. (AR No. 00144). The DOT description of a QCT. Upon which Defendant relies, defines Plaintiff's work as "light", but the DOT requires frequent reaching in its demands analysis for light work. (AR No. 00147). GPC job description reflects that Plaintiff's QT position required frequent reaching above the shoulder level. (AR No. 00110). The two restrictions set forth in the FCE were that Plaintiff could not perform repeated reaching and only occasionally could engage in overhead lifting. (AR No. 00075). This alignment of limitations and duties shows that Plaintiff is unable to perform the material duties of her own occupation as a QCT, and is therefore totally disabled under the LTD plan for initial 24 month time period.

Based upon this information, the Court concludes that the Defendant arbitrarily and capriciously determined that "frequent overhead reaching is no longer considered a material duty of [Plaintiff's] occupation." (AR No. 00100). This determination seems to be solely based on a minimally documented conversation between Defendant's vocational consultant, Ms. Burk, and Plaintiff's former supervisor, Ms. Lindsey. (AR Nos. 00248-00249). The note states that Plaintiff had worked in the "front" of the shop without any scorebin testing for the last two years, this "front of the shop" work providing "QA for film and other products" also required frequent reaching according to DOT specifications. (AR Nos. 00248-00249). Finally, this note states "[o]n other shifts, Pam has the [QTs] rotate their activities." Id. The fact that QTs only rotate activities on "other" shifts indicates that there were some shifts where rotation did not occur. This supports Plaintiff's claim that there were shifts where she worked alone and therefore was required to perform overhead reaching. (AR No. 00250). Except for the Defendant's internal note of that conversation, there is not any documentation to rebut the GPC's description of Plaintiff's material job duties.

The Defendant next argues that whether Plaintiff was required to do overhead lifting for the previous two years is irrelevant. (Docket Entry No. 44, p. 10). The disputed issue here is whether Plaintiff was able to perform frequent reaching, not lifting. Defendant further asserts that the issue over whether Plaintiff's position involved overhead reaching is inconsequential because there is no evidence in the record that she could not perform this task. Id. This assertion is erroneous based on the AR. In addition to the FCE, Defendant's final letter denying Plaintiff's appeal states "the test results supported some restrictions like no repeated reaching". (AR No. 00302). Defendant's initial determination was made with the understanding that Plaintiff's job could involve some reaching. (Docket Entry No. 44, p.10). Yet, the initial denial letter does not give a reasoned explanation to reflect this understanding. (AR Nos. 00138-139). The first denial letter states only that Plaintiff's occupation is considered "light" and that because the FCE determined she was able to perform work in the "light physical demands capacity", she was not totally disabled. Id. Additionally, at the time of its initial determination, Defendant did have access to the DOT demands analysis, that reports frequent reaching as a requirement of this position, not some reaching. (AR No. 00147).

The Court concludes that the Burk-Lindsey note is insufficient to justify denial of an ERISA claim. McDonald, 347 F.3d at 172. Plaintiff challenged this determination, but the AR does not reflect that the Defendant acquired any documentation from GPC in response. (AR No. 00250). Because this determination was a deciding factor in the denial of Plaintiff's benefits and the medical and employment records supported Plaintiff's contention, the Court concludes that Defendant's refusal to investigate the material duties of Plaintiff's position further before making a benefits determination was arbitrary and capricious.

In sum, on the basis of the administrative record, the Court concludes that the Defendant acted arbitrarily and capriciously in denying Plaintiff's LTD benefits during the initial 24 months and thereafter. The Court also concludes that the Defendant failed to give a reasoned explanation based on substantial evidence, as to why frequent reaching was not a material duty of Plaintiff's position when the weight of the evidence suggests otherwise. The fact that Defendant is the administrator and payer of the LTD benefits presents a conflict of interest that reinforces this conclusion.

### 4. Plaintiff's Physicians

Plaintiff argues that the Defendant's decision to deny benefits should be overturned because Defendant disregarded the opinions of Plaintiff's physician. This argument is based on the "treating physician" rule, articulated in <u>Darland v. Fortis Benefits Ins. Co.</u>, 317 F.3d 516 (6th Cir. 2003). The Supreme Court, however, rejected the treating physician rule in <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822 (2003), that accords deference to a Plaintiff's treating physician's opinion unless there is substantial contradicting evidence. The "treating physician rule no longer applies in the ERISA context." <u>Calvert v. Firstar Finance, Inc.</u>, 409 F.3d 286, 293. (6th Cir. 2005).

Plaintiff next argues that Defendant incorrectly disregarded the July 29, 2003 letter from Dr. Schooley that Plaintiff could not do any bending or lifting after a second surgery. The Court finds that the physical impairments of bending and lifting described in this letter are post-operative and therefore are not relevant in making a benefits determination. According to the LTD plan, benefits are payable if the period of disability "starts while you are covered and continues during and past the waiting period." (AR No. 00012). Thus, if Plaintiff's claim for

disability is based purely on her post-operative state, she would have become disabled after her LTD coverage ceased and therefore would not be eligible for benefits.

### 5. Conflict of Interest

Plaintiff contends that a conflict of interest existed that factored into Defendant's denial of benefits. "[A] conflict of interest exists when the insurer both decides whether the employee is eligible for benefits and pays those benefits." Evans v. Unumprovident Corp., 434 F.3d 866, 876 (6th Cir. 2006). In Killian v. Healthsource Provident Adm'rs, Inc., 152 F.3d 514 (6th Cir. 1998), the Sixth Circuit defined this conflict for ERISA purposes:

> "[T]here is an actual, readily apparent conflict ..., not a mere potential for one" where a company both funds and administers an LTD policy, because "it incurs a direct expense as a result of the allowance of benefits, and it benefits directly from the denial or discontinuation of benefits."

Evans, 434 F.3d at 876 (alteration in original) (quoting Killian 152 F.3d at 521). "[B]ecause [the] defendant maintains such a dual role, 'the potential for self-interested decision-making is evident.'" Id. (quoting Univ. Hosps. of Cleveland v. Emerson Elec. Co., 202 F.3d 839, 846 n. 4 (6th Cir.2000)). The conflict of interest inherent in a self-funded plan should be taken into account in reviewing an administrator's decision. Peruzzi v. Summa Medical Plan, 137 F.3d 431, 433 (6th Cir. 1998). When determining if a conflict of interest exists, "[t]he reviewing court looks to see if there is evidence that the conflict in any way influenced the plan administrator's decision." Evans, 434 F.3d at 876.

Here, the Court finds that Defendant had the authority to decide whether Plaintiff was eligible for benefits and was responsible for paying those benefits; therefore a conflict of interest existed at the time of the Defendant's decision to deny benefits. Denial of Plaintiff's claim would result in Defendant avoiding payment of benefits and therefore increasing its profits. Additionally, the medical information relied on by Defendant for its disability determination was

24

based upon the FCE of Rob Pearse, who was contracted by Defendant, and the medical file review of Dr. Schmidt, who is employed by Defendant. Thus, the Court finds of a conflict of interest here, but that finding "does not displace the arbitrary and capricious standard of review; rather, it is a factor that [the Court] consider[s] when determining whether the administrator's decision to deny benefits was arbitrary and capricious." Evans 434 F.3d at 876.

Based upon its earlier findings and conclusions, this conflict enhances the Court's earlier conclusion that the Defendant's denial of LTD benefits was arbitrary and capricious.

### 6. Prejudgment Interest

ERISA does not require an award of prejudgment interest. Ford v. Uniroyal Pension Plan, 154 F.3d 613, 616 (6th Cir. 1998). The district court, however, possesses the discretion to grant prejudgment interest on an ERISA award as a matter of equity. Id. An award of prejudgment interest would compensate Plaintiff for the lost interest value of money wrongly withheld from her. Id. at 618. Given the need to make Plaintiff whole and to avoid any financial incentive to deny benefits wrongly, the Court concludes that equity requires an award of prejudgment interests to give Plaintiff the full value of the benefits that she was denied.

"ERISA does not prescribe the applicable prejudgment interest rate". Id. at 615. The determination of the rate is left to the discretion of the district court. Id. at 619. The rate of prejudgment interest will be determined under Tennessee law unless the Defendant can demonstrate that Tennessee law overcompensates Plaintiff and is therefore punitive. Id. The Plaintiff is also entitled to post-judgment interest from the date of this judgment until paid.

### 7. Attorney Fees

ERISA allows a "court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). In <u>Shelby County Health Care Corp. v. Southern Council of Indus. Workers Health and Welfare Trust Fund</u>, 203 F.3d 926 (6th Cir. 2000), the Sixth Circuit listed the following factors a district court must consider in deciding whether to award attorney fees in an ERISA case:

> (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions.

<u>Id</u>. at 946 (citations omitted).

Here, the Court finds that Defendant's level of culpability is high and Defendant has the ability to afford an award of attorney fees. A fee award would serve as a deterrent to other plan administrators' arbitrary and capricious denials of benefits. An award of fees would confer a benefit on other LTD plan participants who are denied benefits due to an arbitrary and capricious determination of the material duties of their occupation. Finally, as reflected in the Court's conclusions, Plaintiff had a much stronger position on the merits, as was required to overcome the arbitrary and capricious standard of review. Thus, the Court awards Plaintiff her attorney fees and costs that will be determined in accordance with federal law and Local Rules.

### C. CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiff's motion for judgment on the record (Docket Entry No. 40) should be granted and that Defendant's motion for judgment on the record (Docket Entry No. 43) should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the ___11___ day of July, 2006.

WILLIAM J. HAYNES, JR.
United States District Judge